<p style="text-align:center; color:red">**CORRECTED**</p>

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 17-598V
### Filed: January 31, 2020
Unpublished

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
ROSS VINOCUR,                      *
                                   *
                Petitioner,        *      Decision Awarding Damages; Pain
                                   *      and Suffering; Influenza (Flu) Vaccine;
v.                                 *      Shoulder Injury Related to Vaccine
                                   *      Administration (SIRVA)
SECRETARY OF HEALTH                *
AND HUMAN SERVICES,                *
                                   *
                Respondent.        *
                                   *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

*Shaelene Wasserman, Muller Brazil, LLP, Dresher, PA, for petitioner.*

*Daniel Anthony Principato, U.S. Department of Justice, Washington, DC, for
respondent.*

### DECISION AWARDING DAMAGES[1]

**Dorsey,** Special Master:

On May 4, 2017, Ross Vinocur ("petitioner") filed a petition for compensation
under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et
seq.*,[2] (the "Vaccine Act" or "Program") for a left shoulder injury, diagnosed as adhesive
capsulitis, caused in fact by the influenza vaccination he received on November 9,
2014.  Petition at 1, ¶¶ 2, 8, 10, ECF No. 1.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website.
**This means the decision will be available to anyone with access to the internet.**  In accordance with
Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information,
the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the
undersigned agrees that the identified material fits within this definition, the undersigned will redact such
material from public access. Because this unpublished decision contains a reasoned explanation for the
action in this case, undersigned is required to post it on the United States Court of Federal Claims'
website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal
Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for
ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. §
300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$70,705.23, representing compensation in the amount of $70,000.00 for actual pain and suffering and $705.23 for actual unreimbursable expenses.**

I.        **Procedural History**

Along with the petition, petitioner filed the medical records required by the Vaccine Act.  *See* Exhibits 1-4, ECF No. 1; Statement of Completion, ECF No. 2; *see also* § 11(c)(2) (for a description of the required medical records).   The case was assigned to the Special Processing Unit ("SPU").  An initial status conference was scheduled for June 16, 2017.

During the call, petitioner's counsel confirmed that all known and updated medical records had been filed.  Order, issued June 16, 2017, at 1, ECF No. 8.  The staff attorney managing this SPU case suggested that a detailed affidavit from petitioner, describing his injury, particularly the onset of his pain and reason for delay in seeking treatment, would be helpful.  *Id.*  Petitioner filed his affidavit on August 1, 2017.  ECF No. 9.  On December 20, 2017, respondent filed a status report indicating he intended to defend this case.  ECF No. 13.  He requested to file his Rule 4 report by January 29, 2018.  *Id.*

In his Rule 4 report, respondent argued that compensation was not appropriate in this case because petitioner had failed to establish that he suffered a Table Injury or that his injury was caused by the influenza vaccination he received.  Respondent's Rule 4 Report ("Rule 4 Report") filed Jan. 29, 2018, at 3-5, ECF No. 17.  Regarding a Table SIRVA, respondent maintained "the record does not demonstrate that petitioner's symptoms began within 48 hours after vaccination."  *Id.* at 3; *see* 42 C.F.R. § 100.3(a)(XIV) and (c)(10)(ii) (requiring petitioner's pain to have occurred within 48 hours of vaccination).  He stressed that "[p]etitioner did not seek medical care until more than four months after vaccination."  Rule 4 Report at 3.  Additionally, he asserted an earlier occurrence of frozen right shoulder suggests petitioner "may have underlying pathology and a propensity to develop adhesive capsulitis, not related to the vaccine" and that the hand tremors suffered by petitioner "suggests there could be some underlying neurological issue, which would also preclude petitioner from establishing causation under the Table."  *Id.* at 4.  When arguing petitioner had not provided preponderant evidence to establish causation in fact, respondent again mentioned the four-month delay in treatment and possible alternative causes for petitioner's injury *Id.* at 5.  After reviewing the Rule 4 report, the undersigned directed the staff attorney to hold a call with the parties to inform them of her initial impressions and to discuss the next step in this case.

During the call held on February 23, 2018, the staff attorney informed the parties that the undersigned believed petitioner's history of adhesive capsulitis in the opposite

(right) shoulder almost five years earlier would not preclude petitioner from establishing causation in this case. *See* Order, issued Mar. 6, 2018, at 1, ECF No. 18. She added that the undersigned had further indicated she was not aware of a neurological problem which would cause both petitioner's hand tremors and the SIRVA type of symptoms experienced by petitioner. *Id.* She informed petitioner's counsel that the undersigned wished to see affidavits from petitioner and any lay witnesses addressing the onset and duration of his hand tremors and his left shoulder adhesive capsulitis and medical records related to his hand tremors, particularly any which show a diagnosis of this condition. *Id.* at 1-2. Respondent's counsel added that any affidavits from non-family members would be particularly helpful. *Id.* at 2.

A few months later, petitioner filed a second affidavit and additional medical records from his primary care provider ("PCP"), Arnold Koff, M.D. *See* Exhibits 6-7, filed Apr. 11, 2018, ECF No. 19. The following month, he filed an affidavit from a co-worker, Chris Cobb. *See* Exhibit 8, filed May 2, 2018, ECF No. 22. On May 22, 2018, the staff attorney held a status conference with the parties to inform them that the undersigned wished to hold a fact hearing in this case. Pre-Hearing Order, issued June 11, 2018, at 1, ECF No. 23. Deadlines for the parties' pre-hearing submissions were set. *Id.* at 2.

The fact hearing was held on November 6, 2018, in Washington, D.C. Petitioner was the only witness and testified remotely, utilizing video conferencing. Following the hearing, the parties were given 30 days to supplement the record, and two articles regarding SIRVA injuries were filed as Court Exhibits I and II.[3] On January 31, 2019, the undersigned issued a ruling on entitlement finding compensation was appropriate in this case. ECF No. 30.

Over the next six months, the parties exchanged multiple offers and counteroffers in an attempt to informally resolve the issue of damages. On June 24, 2019, they indicated they had reached an impasse in their damages discussions. Status Report at 1, ECF No. 39. They requested the undersigned set deadlines for their briefs regarding the appropriate amount of damages in this case.

In a subsequent joint status report, the parties confirmed their impasse continued, that they had agreed upon an amount of compensation for petitioner's unreimbursable expenses, that petitioner would not be seeking compensation for lost wages, and that their only disagreement was regarding the appropriate amount of damages for petitioner's pain and suffering. Status Report, filed July 25, 2019, at 1, ECF No. 42. The parties also agreed that all medical records had been filed.[4] *Id.*

---

[3] These articles are S. Atanasoff et al., *Shoulder injury related to vaccine administration (SIRVA)*, 28 Vaccine 8049 (2010), filed as Court Exhibit I and M. Bodor and E. Montalvo, *Vaccination Related Shoulder Dysfunction*, 25 Vaccine 585 (2007), filed as Court Exhibit II.

[4] The parties indicated that petitioner planned to file affidavits regarding petitioner's pain and suffering by the end of August 2019. However, it appears this notation referred to the affidavit from petitioner and his wife filed six days earlier, on July 19, 2019. *See* Exhibits 10-11, ECF No. 41.

In August 2019, petitioner filed his brief.  Petitioner's Brief in Support of Damages ("Pet. Brief"), ECF No. 43.  Approximately one month later, respondent filed his responsive brief.  Respondent's Brief on Damages ("Res. Brief"), ECF No. 44.  Thereafter, the case was removed from SPU.  Notice, issued Sept. 30, 2019.  Petitioner did not file a reply to respondent's brief.

The matter is now ripe for adjudication.

## II.      Relevant Medical History

Initially, petitioner filed medical records from his PCP, Dr. Koff at Avon Health, from three years prior to vaccination as recommended for most adult vaccinees.[5]  *See* Exhibit 4 at 2 (requesting medical records from 11/1/11 to the present).  Later, petitioner filed additional records from as early as October 2004.  *See* Exhibit 7.

These earlier records show that petitioner was seen twice in 2004 and three times in 2006, for tightness in his chest, difficulty clearing his throat, several episodes of vertigo, hypothyroidism, and chronic sinusitis.  Exhibit 7.  On October 26, 2004, he underwent a treadmill test (*id.* at 8) and was provided samples of Nexium in May 2006 (*id.* at 10).   In the records from the visits in 2006, it is noted that petitioner's symptoms did not prevent him from running and playing soccer.  *Id.* at 11.

Petitioner next visited his PCP on March 28, 2013, for an annual physical.  Exhibit 4 at 4.  In the history section of this record, petitioner's long-term chest palpitations and chronic throat clearing are described.  Also, listed is "mild trembling in [petitioner's] right hand when grasping an object such as a coffee mug close to the body."  *Id.*  It is recorded that petitioner has experienced this tremor "for more than 10 years with no change."  *Id.*

Petitioner received the influenza vaccination at the minute clinic in the CVS pharmacy on November 9, 2014.  Exhibit 1 at 3-4.  Following this vaccination, petitioner did not receive medical care until he sought treatment for his left shoulder adhesive capsulitis from Roy D. Beebe, M.D., an orthopedist at UConn Health Center, approximately four and one-half months later, on March 25, 2015.  Exhibit 2 at 16.  The record from that visit indicates petitioner had experienced three months of left shoulder pain since receiving the influenza vaccination in December 2014.  His discomfort was described as gradually worsening until he experienced significant pain at night and at rest and a significant loss of motion.  In this record, it is noted that petitioner previously suffered from adhesive capsulitis in his contralateral (right) shoulder.  *Id.*

---

[5] *See Guidelines for Practice under the National Vaccine Injury Compensation Program* at 13-14, http://www.uscfc.uscourts.gov/sites/default/files/19.01.18%20Vaccine%20Guidelines.pdf (last visited on Jan. 15, 2020).

Dr. Beebe performed a physical examination of petitioner's left shoulder which revealed petitioner had mild diffuse tenderness, forward flexion to 80 degrees, abduction to 45 degrees, and no external rotation.  Exhibit 2 at 16.  He ordered x-rays of petitioner's left shoulder which were normal, administered a cortisone injection, prescribed a narcotic opioid for nighttime, and ordered aggressive physical therapy ("PT").  *Id.* at 16-18; *see also* Exhibit 3 at 10 (Rx for PT).

Petitioner attended 10 PT sessions at Magna Physical Therapy & Sports Medicine Center, LLC ("Magna PT") in April 2015.  Exhibit 3 at 11-20.  At his first visit on April 2, 2015, petitioner reported that his symptoms started in November 2014, and that he believed they were caused by the "flu shot" he received.  *Id.* at 7.  Describing his pain as a low-level ache which had increased in the past three weeks, petitioner rated the severity of his pain at five out of ten currently, three out of ten at its best, and nine out of ten at its worst.  *Id.* at 5, 8.  In the PT record from this initial visit, it is noted that Dr. Beebe had diagnosed petitioner with left frozen shoulder and administered an injection which had been "helpful for a few day[s]."  *Id.* at 5.  Petitioner reported that he had suffered from adhesive capsulitis in his right shoulder in 2010 which took approximately six months to resolve.  *Id.* at 7, 11.  Although he participated in PT for this earlier injury, he "did not complete his therapy due to frustration with chronicity."  *Id.* at 11.  Observing that petitioner's current symptoms were consistent with left shoulder adhesive capsulitis, the physical therapist recorded impairments in petitioner's range of motion ("ROM"), strength, and functionality.  He recommended that petitioner attend PT three times per week for four weeks.  *Id.* at 12.

At his last visit in April 2015, due to the level of his pain and increased discomfort following treatment, petitioner questioned whether he should continue with PT.  Exhibit 3 at 20.  In response, the physical therapist "[d]iscussed [the] importance of relaxation during manual stretching" and increasing petitioner's home exercise program ("HEP").  *Id.*  He observed that petitioner had made good progress increasing his ROM but still showed significant guarding and pain at the end of his movement.  After decreasing the amount of manual stretching performed during the session, the therapist noted that petitioner tolerated the treatment better.  *Id.*

Towards the end of April 2015, petitioner visited his PCP, Dr. Koff, seeking his opinion on his left frozen shoulder.  Exhibit 4 at 12.  At that visit, petitioner reported that his pain started in November 2014 when he received the influenza vaccination.  Noting that his pain had not relented, petitioner indicated that he began to have difficulty moving his shoulder two months ago.  He informed Dr. Koff that Dr. Beebe had diagnosed him with frozen shoulder and prescribed oxycodone which he took only at night.  He explained that he had experienced some improvement in ROM since starting PT two weeks ago.  *Id.* Although not clearly indicated in these records, it appears Dr. Koff prescribed a different medication, piroxicam.[6]  *See* Exhibit 2 at 15 (record from later visit with Dr. Beebe).

---

[6] Piroxicam is a nonsteroidal anti-inflammatory drug used for treatment of conditions such as rheumatoid arthritis and osteoarthritis.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1450 (32th ed. 2012).

Petitioner returned to Dr. Beebe for follow-up regarding his left shoulder adhesive capsulitis on June 1, 2015.  Exhibit 2 at 15.  He reported that his pain had improved, but that he still had marked, although also improved, pain at night.  He tried taking meloxicam to facilitate better sleep but found it did not help.  Upon examination, Dr. Beebe observed that petitioner's forward flexion remained at 80 degrees, but his abduction had improved to 80 degrees and his external rotation had improved to 30 degrees.  He instructed petitioner to continue aggressive PT.  *Id.*

 Petitioner was re-evaluated at Magna PT on June 4, 2015.  Exhibit 3 at 21.  In this record, it is noted that he had received PT in April 2015 but had not been treated for over a month due to travel and work.  After seeing his orthopedist, he was referred again to PT.  Petitioner's pain and limited ROM continued but were described as improved.  *Id.*

Petitioner attended five PT sessions in June and July 2015.  Exhibit 3 at 21-27.  At his last PT session on July 2, 2015, he reported that he "fe[lt] about the same."  *Id.* at 27.  Observing that petitioner still suffered from significant limitation in his external rotation, the therapist indicated petitioner would "continue to benefit from skilled PT to increase ROM and strength in order to maximize functional mobility."  *Id.*  In addition to recommending additional PT, the therapist encouraged petitioner to continue his HEP.  *Id.*

Almost a year later, on May 26, 2016, petitioner was seen at UConn Health Urgent Care for a cough.  There is no mention of any other condition, including petitioner's left shoulder adhesive capsulitis.  Exhibit 2 at 11-14.

On August 11, 2016, petitioner visited his PCP, Dr. Koff, for his annual physical.  Exhibit 4 at 20.  At this visit, he indicated that he had "no further problems with [his] shoulder."  *Id.* (all letters capitalized in the original).

He returned to his PCP three months later, on November 10, 2016, to check on other conditions and to discuss recent bloodwork.  Exhibit 4 at 24.  The medical record from this visit reveals petitioner had full ROM and was not taking any medication but was avoiding sleeping on his left shoulder due to ongoing discomfort.  This is the last medical record which mentions petitioner's left shoulder injury.  *Id.*

## III.    Testimony and Affidavits

Petitioner filed affidavits in August 2017 and April 2018.  *See* Exhibits 5-6.  In both, he indicated he received the influenza vaccination alleged as causal at the CVS Pharmacy on November 9, 2014.  Exhibits 5 at ¶ 2; 6 at ¶ 2.  In the earlier affidavit,

---

According to petitioner, this medication failed to alleviate his pain.  Exhibit 6 at 6 (petitioner's second affidavit); Testimony ("Tr.") at 24.

executed on August 1, 2017, petitioner recounted dull pain immediately upon vaccination which increased over the subsequent weeks and months.  Exhibit 5 at ¶ 3. In the later affidavit, executed on April 4, 2018, petitioner described his pain and stiffness as starting that night or by the next morning.  Exhibit 6 at ¶ 4.

During the fact hearing, petitioner testified that he felt a burning pain upon injection, as though he "could feel the serum going in."  Tr. at 10.  He stated that the injection was more painful than other vaccinations he had received.  *Id.*  When asked about the seemingly inconsistent information regarding the onset of his pain in his affidavits, petitioner indicated that he felt localized pain immediately upon injection and pain and stiffness more reminiscent of the symptoms he experienced in his right shoulder in 2010, by the next day.  Tr. at 11.

In his testimony and both affidavits, petitioner indicated he did not seek immediate medical treatment due to his earlier experience with adhesive capsulitis in his right shoulder which "seemed to go away only with the passage of time" after approximately six months.  Exhibit 5 at ¶ 4; *accord.* Exhibit 6 at ¶ 4; Tr. at 7-8, 16-17. He testified that, during this time, he initially self-treated with over the counter medications and some of the stretching exercises he performed in 2010.  Tr. at 15-16. When petitioner's symptoms continued and became worse than those he experienced in 2010, he sought medical treatment from Dr. Beebe.  Tr. at 17; Exhibit 5 at ¶ 4. Petitioner stated that he also "waited to see the same specialist doctor," presumably Dr. Beebe who he saw on March 25, 2015.  Exhibit 6 at ¶ 5.  He testified that by that time, "[his] arm was almost totally useless if [he] moved it at all . . . [and that he experienced] heightened pain with any type of movement."  Tr. at 17.  When asked by petitioner's counsel if he was experiencing difficulty sleeping, petitioner responded, "Most definitely, yes."  Tr. at 19.

During both direct and cross examination, petitioner was asked about differing notations in the medical records regarding the timing of his vaccination and duration of his left shoulder pain.  For example, during cross examination, respondent's counsel asked about an entry in the medical records from petitioner's April 23, 2015 visit to Dr. Koff which indicated he experienced difficulty moving his left shoulder beginning two months earlier.  Tr. at 33-34; *see* Exhibit 4 at 12.  In response, petitioner theorized that he may have been referring to a time when he experienced increased pain during movement.  Tr. at 34.   He testified that he did not know why he did not include any information regarding his immediate pain, upon injection, in his later affidavit, instead discussing only the timing of his pain and stiffness, which he indicated occurred that evening or the next morning.  Tr. at 35.

Throughout his testimony, petitioner described his condition and the effect it had on him.  Regarding notations in the medical records from his March 25, 2015 visit to Dr. Beebe about his lack of external rotation, petitioner confirmed that he had limited movement at that time.  He indicated that "at best, [he] could probably bring [his] arm out a little bit to the side or low down in the front" but could not move his arm behind him or higher than what he described.  Tr. at 20.  Petitioner testified that he had difficulty

dressing but could perform his work, which involved sitting at a desk and typing.  Tr. at 20.  While indicating the steroid injection he received on March 25, 2015 relieved his pain for only one day, petitioner testified that he did gain greater and less painful movement thereafter.  Tr. at 21.   He confirmed that his PCP, Dr. Koff, provided him with a prescription for steroids at a visit on April 23, 2015.  Tr. at 24.

Regarding the 15 PT sessions he attended during April through July 2015, petitioner indicated he did not tolerate these sessions well.  Tr. at 24.  He described them as "[v]ery painful", rating the level of his pain at seven to eight on a scale of ten.  Tr. at 25.  Although acknowledging a temporary improvement in ROM following these sessions, petitioner testified that "by the next day I was back to square one."  Tr. at 24-25.  He disputed the 50% improvement in ROM reflected in the PT records, rather describing it as a temporary improvement of 25%.  Tr. at 25-26.  Remembering that his 2010 right shoulder condition resolved on its own, petitioner discontinued PT on July 2, 2015.  He stated that he concluded the PT "wasn't worth . . . the cost, the pain, the time, and so forth."  Tr. at 27.  Petitioner estimated that his symptoms resolved approximately a month thereafter in August 2015.  Tr. at 27-28.

In response to questioning from respondent's counsel during the November 2018 fact hearing, petitioner testified that, to his knowledge, he had not missed any soccer games due to his condition.  Tr. at 37-38.  However, he pointed out that he is not a goalie and thus, would not be required to throw the ball.  Tr. at 38.  However, in his second affidavit executed in July 2019, petitioner indicated his left shoulder condition "eliminated any participation in league soccer."  Exhibit 10 at ¶ 2.  In this affidavit, petitioner stated he had difficulty dressing, sleeping, driving, and household chores such as yardwork.  *Id.*  He recounted an episode driving when his pain was so great that he thought he would pass out.  *Id.* at ¶ 4.  He maintained that, according to his PT records, his ROM was much less in 2015 than in 2010 during his right shoulder adhesive capsulitis.  *Id.* at ¶ 3.  While describing his daytime pain as negligible, in this July 2019 affidavit, petitioner claims his night time pain is still significant.  *Id.* at ¶ 6.  Believing he has "a tear in the shoulder," petitioner states he would rather live with his current condition than undergo surgery.  *Id.*

In his affidavit, a co-worker, Chris Cobb, provides support for petitioner's assertions regarding his inability to sleep and limited ROM.  Exhibit 8 at ¶¶ 5-6.  However, Mr. Cobb appears to be focused on the period shortly after vaccination, in fall 2014.  For example, Mr. Cobb recalled an instance after Thanksgiving when petitioner stated he "was having difficulty lifting his arm over his head and that his range of motion was painful."  *Id.* at ¶ 6.  The undersigned notes that Mr. Cobb's affidavit was obtained while respondent was disputing entitlement in this case, specifically the onset of petitioner's pain.

In contrast, the affidavit from petitioner's wife, Nancy Vinocur, which was executed in July 2019, is focused on petitioner's pain and suffering from vaccination to the present.  Exhibit 11.  Mrs. Vinocur described petitioner's past difficulties sleeping and performing household chores.  *Id.* at ¶¶ 4-6.  Like her husband, she maintains his

symptoms in 2015, from his left shoulder adhesive capsulitis, were worse than those he experienced in 2010.  *Id.* at ¶ 3.  She also claims her husband's sleep is still being affected.  *Id.* at ¶ 6.

## IV.    The Parties' Arguments

Petitioner seeks damages in the amount of $95,000.00 for his pain and suffering and $705.23 for past medical expenses.  Pet. Brief at 1.   Petitioner represents that respondent agrees with the amount sought for petitioner's past medical expenses and disputes only the amount sought for petitioner's pain and suffering.  *Id.*

Later in his brief, petitioner clarifies that the amount sought for his pain and suffering, $95,000.00, represents compensation in the amount of $90,000.00 for his past pain and suffering and in the amount of $5,000.00 for his future pain and suffering.  Pet. Brief at 7.  Requesting that the $5,000.00 payment be made for the subsequent year (Year 1) and reducing the amount to net present value using a net rate discount of 1%,[7] petitioner requests a present award in the amount of $4,950.00.  *Id.*  Thus, the undersigned understands that petitioner is seeking an award of $95,000.00, reduced to a net present value of 94,950.00, for his pain and suffering and the amount agreed upon by the parties, $705.23, for his actual unreimbursable expenses for a total award of $95,655.23.

In support of the amount sought for his past pain and suffering, petitioner stresses the allegations made by petitioner concerning his length of treatment, number of PT sessions, limitations he experienced, and treatment he required (such as a steroid injection and strength of medication he required to sleep).  Pet. Brief at 4-7.   He compares his pain and suffering to that experienced by the petitioners in four cases in which the undersigned awarded $60,000.00 to $95,000.00, *Attig, Capasso, Knauss,* and *Dhanoa.*[8]  Arguing that his circumstances are most like those suffered by the petitioner in *Attig,* who was awarded $75,000.00 for her pain and suffering, petitioner maintains that he treated for one year and seven months; attended 15 PT sessions; required x-rays, one cortisone injection, and narcotic medication to sleep; performed home

---

[7] As petitioner acknowledges, any award for petitioner's projected pain and suffering must first be reduced to its net present value.  *See* § 15(f)(4)(A).

[8] *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Capasso v. Sec'y Health & Human Servs.*, No.17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses).

exercises; and was unable to participate in valued activities such as playing in his soccer league.  *Id.* at 4-6.

Regarding his projected pain and suffer, petitioner maintains that "he still experiences left shoulder pain and difficulty sleeping as a result of ongoing shoulder pain."  Pet. Brief at 6.  Asking for an award of compensation for his future pain and suffering similar to that awarded in *Dhanoa*, he continues to experience pain which disturbs his sleep to this day."  *Id.* at 6.

Respondent argues that petitioner should be awarded $32,500.00 as compensation for his pain and suffering and the $705.23 agreed upon by the parties for petitioner's unreimbursable expenses.  Res. Brief at 1.  Describing petitioner's condition as "a relatively minor injury" which required "relatively little treatment," respondent notes that petitioner "delayed seeking treatment for more than four months."  *Id.* at 4.  Respondent stresses that petitioner's last treatment occurred on July 2, 2015, approximately eight months after vaccination, and reported no further shoulder issues approximately one month after that.  *Id.*  Respondent disputes petitioner's assertion that he was unable to participate fully in his soccer league by pointing to petitioner's testimony at the fact hearing in this case when he testified that his condition had not interfered with his ability to play.  *Id.* at 5 n.3.

Regarding any ongoing symptoms, respondent acknowledges petitioner reported additional difficulty sleeping at a November 2016 visit to his PCP but emphasizes that petitioner exhibited full ROM at this visit.  Res. Brief at 4.  He asserts that petitioner has not provided any evidence to support his claims of ongoing symptoms.  *Id.*

Respondent argues the cases cited by petitioner are distinguishable from this case which he claims has a more significant delay in treatment and shorter length of treatment than any of the cited cases.  Res. Brief at 5.  He stresses that petitioner indicated no further problems in August 2015 and did not mention his difficulties sleeping until more than a year later during a November 2016 appointment to his PCP.  *Id.*

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).  Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary."  § 15(a)(1)(B).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health &*

*Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, I may also rely on my own experience adjudicating similar claims.[9]  *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  *Graves*, 109 Fed. Cl. at 590.  Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id.* at 595.

---

[9] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to undersigned as the former Chief Special Master, now Special Master Dorsey.

## VI.      Prior SIRVA Compensation in SPU Cases

Although this case was removed from SPU on September 30, 2019, the undersigned finds statistical data from SIRVA cases resolved in SPU to be informative.

### A. History of SIRVA Settlement and Proffer[10]

SIRVA cases have an extensive history of informal resolution within the SPU.  As of January 1, 2020, 1,405 SIRVA cases have informally resolved[11] within the Special Processing Unit since its inception in July of 2014.  Of those cases, 817 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[12]  Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99.[13]  The median award is $95,000.00. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00.[14]  The median award is $70,000.00.  In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of

---

[10] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximate.

[11] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

[12] Additionally, there have been 21 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[13] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 21 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

[14] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B.  Prior Decisions Addressing SIRVA Damages

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages.  Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

### i.    Below-median awards limited to past pain and suffering

In seventeen prior SPU cases, the petitioner was awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards for actual pain and suffering ranged from $60,000.00 to $90,000.00.[15]  These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual

---

[15] These cases are: *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursed expenses); *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursed expenses); *Lucarelli v. Sec'y of Health & Human Servs.*, No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursed expenses); *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); *Capasso*, 2019 WL 5290524 (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursed expenses); *Schandel v. Sec'y of Health & Human Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursed expenses); *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursed expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursed expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursed expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig*, 2019 WL 1749405 (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursed medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursed medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursed medical expenses); *Knauss*, 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursed medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursed medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursed medical expenses).

pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema.  The duration of injury ranged from six to 29 months and, on average, these petitioners experienced approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months.  However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less.  Slightly less than one-half were administered one to two cortisone injections.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery. The petitioners in *Schandel, Garrett,* and *Weber* attended PT from almost four to five months, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA.   Several of these cases (*Goring, Lucarelli, Kent, Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award. These awards have ranged from $110,000.00 to $160,000.00.[16]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Seven out of eight underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more

---

[16] These cases are: *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); *Kelley v. Sec'y of Health & Human Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); *Wallace v. Sec'y of Health & Human Servs.*, No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

significant findings.  In seven out of eight cases, MRI imaging showed possible evidence of partial tearing.[17]  No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 45 days.  Duration of physical therapy ranged from one to 28 months and six out of the eight had cortisone injections.

### iii.   Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the petitioner was awarded compensation for both past and future pain and suffering.[18]  In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in *Hooper*), medical opinions indicated that their disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.  In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis.  The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

---

[17] In *Reed*, MRI showed edema in the infraspintaus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[18] These cases are: *Dhanoa*, 2018 WL 1221922 (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

**VII.    Appropriate Compensation in this SIRVA Case**

In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact his awareness of his injury.  Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

**A.  Severity of Pain and Suffering**

The medical records in this case establish that petitioner suffered a SIRVA injury with levels of pain and limited ROM which gradually worsened during the four to five months after vaccination, from November 2014 until March 2015. By March 2015, petitioner's symptoms were significant.  While attending 10 PT sessions in April 2015, petitioner continued to experience severe pain but showed some improvement in ROM. Following a one month break from PT, petitioner's shoulder condition had greatly improved.  He completed 5 additional PT session in June and early July 2015 and testified that his shoulder issues resolved within a month thereafter.

**i.    Gradual increase in pain and limited ROM from vaccination until treatment**

When first seen by orthopedist Dr. Bebee on March 25, 2015, petitioner reported the discomfort he felt after receiving the influenza vaccination had gradually worsened over the subsequent four to five months.  Exhibit 2 at 16.  He repeated this description of immediate, but dull, pain which increased over the subsequent weeks and months at his initial PT session on April 2, 2015, and in his first affidavit executed on August 1, 2017.  Exhibit 3 at 7; Exhibit 5 at ¶ 3.  Additionally, the medical records from petitioner's initial PT session, on April 2, 2015, show petitioner reported an initial low-level ache had increased in in the past three weeks.  Exhibit 3 at 7.  Regarding his limited ROM, during an April 23, 2015 visit to his PCP, petitioner pinpointed the start of his limited ROM as two months prior, which would have been the end of February 2015.  Exhibit 2 at 14.

The fact that petitioner delayed seeking treatment until more than four months after vaccination similarly supports the premise that petitioner's initial pain and limited ROM were not significant.  This delay is not unreasonable, especially in light of petitioner's explanation that his initial symptoms mirrored the right shoulder adhesive capsulitis that he experienced in 2010, which resolved on its own.  However, it does support petitioner's own representations that his initial symptoms were less severe.
.

**ii.    Significant symptoms reflected in medical records during initial treatment, four to six months after vaccination**

When he first sought medical treatment for his injury, from Dr. Bebee on March 23, 2015, petitioner described his current level of pain, both at night and at rest, and his limited ROM as significant.  Exhibit 2 at 16.    This description is reinforced by the physical examination which revealed petitioner's limited ROM and Dr. Bebee's

diagnosis of adhesive capsulitis, administration of a steroid injection, and prescription of nighttime narcotics and aggressive PT. *Id.* at 16-17. On the intake form for his initial PT session, petitioner rated his current pain at a level of five out of ten, reporting a range at other times from three to nine. Exhibit 3 at 5, 8. He recounted severe pain within the last 24 hours. *Id.* at 11.

Petitioner continued experiencing varying, but severe, levels of pain throughout his 10 PT sessions in April 2015. He reported one episode of improved pain on April 20, 2015 (exhibit 3 at 16), but worsening pain at the prior and subsequent sessions (*id.* at 14, 17). At his 9th PT session, on April 22, 2015, despite an improvement in his ROM, petitioner questioned whether he should continue PT. *Id.* at 17.

The record establishes petitioner suffered severe pain and limited ROM in late February through April 2015.

### iii.   Improvement in petitioner's condition seven to nine months after vaccination

After a brief break, due to travel and work, petitioner returned to PT in early June 2015. At that time, he reported pain at a level of one out of ten, indicating his chief complaint was nighttime pain. Exhibit 3 at 4. The reevaluation of petitioner's shoulder injury, performed on June 4, 2015, revealed further improvement in both shoulder flexion and abduction. *Id.* at 21.

It does not appear that petitioner made much progress during the 5 PT sessions he attended in June and early July 2015. During this time, he consistently indicated no improvement from the last session. *E.g.*, Exhibit 3 at 26. At his last PT session, on July 2, 2015, petitioner's left shoulder condition was assessed as 50% improved. *Id.* at 27. While petitioner testified his improvement was closer to 25%, the information contained in petitioner's PT records show that, from early April though early June, petitioner's level of pain had improved from severe to mild and his shoulder flexion and abduction had improved from 70 to 130 degrees and 45 to 110 degrees respectively. *Compare id.* at 11 *with id.* at 22. Even petitioner's external rotation had improved from 10 to 40 degrees. *Id.*

At the November 2018 fact hearing, petitioner testified that his symptoms resolved about a month after his last PT session which occurred on July 2, 2015. Tr. at 28. When seen for a cough almost ten months later, petitioner did not mention his shoulder injury. Exhibit 2 at 11-14. He indicated he had no further shoulder problems in August 2016.

There is evidence, however, that petitioner was experiencing some mild discomfort, especially at night. In November 2016, during a visit to discuss his recent bloodwork, petitioner informed his PCP that, due to discomfort, he was avoiding sleeping on his left shoulder. In that same record, there are notations showing petitioner had full ROM and was not taking medication to alleviate his pain or to help

him sleep.  Exhibit 4 at 24.

The record establishes that petitioner's pain had improved from severe to mild and his ROM increased approximately 50% by early June 2015.  Petitioner himself indicated his shoulder issues resolved by August 2015.

### iv.    Current and future condition

In his most recent affidavit, petitioner describes his daytime pain as negligible, but maintains that his nighttime pain is still significant.  Exhibit 10 at ¶ 6.  He states that he believes he has "a tear in the shoulder" which requires surgery which he is choosing to forego.  *Id.*  However, there is nothing in the record to support petitioner's assertions regarding a tear or need for surgery or to establish that he has sought further treatment for his left shoulder injury.

Regarding petitioner's claim that his left shoulder injury continues to interfere with his sleep, the undersigned accepts that petitioner continues to have some mild discomfort which forces him to avoid sleeping on his left shoulder.  The affidavit from petitioner's wife and entry in the record from his November 2016 visit to his PCP supports this impression.  Exhibit 11 at ¶ 6; Exhibit 4 at 24.  However, petitioner's discomfort was not sufficient enough to cause him to seek further treatment or request medication to help him sleep.

Thus, petitioner's allegations of significant nighttime pain are not supported by the record in this case, and there is no medical opinion which states that petitioner has suffered a permanent injury.  Thus, petitioner has not provided preponderant evidence to support an award for projected pain and suffering.

### B.  Comparison to Other SIRVA Awards

In his brief, petitioner compares his pain and suffering to that experienced by the petitioners in *Attig, Cappaso, Knauss*, and *Dhanoa*.  Pet. Brief at 4-5. He argues that his pain and suffering most closely mirrors that experienced by the petitioner in *Attig* who treated for one year, received a cortisone injection, underwent an MRI, and attended 12 PT sessions.  *Id.* at 4; *see Attig,* 2019 WL 7049405, at *2-3.  Arguing that he should be awarded $90,000.00 for his actual pain and suffering, $15,000.00 more than the petitioner in *Attig,* petitioner maintains that he sought treatment of his injury for one year and seven months, attended 15 PT sessions, required a cortisone injection and narcotic medication to sleep, and was unable to participate in valued activities such as playing in his soccer league.  Pet. Brief at 4-6.

The undersigned does not find supportive evidence for awarding $90,000.00 here.  As indicated in the previous section, the undersigned finds that petitioner underwent treatment for his left shoulder injury for less than four months, from late March through early July 2015.  During the subsequent 16 months, petitioner sought medical treatment on two occasions.  At these appointments, he either did not mention

his shoulder condition or indicated he had experienced no further issues.  Almost 20 months after he last sought treatment, petitioner mentioned an inability to sleep on his left shoulder at a November 2016 appointment with his PCP.   However, the purpose of that visit was to discuss recent bloodwork, and petitioner did not request treatment for his shoulder pain.  Exhibit 4 at 24.

Additionally, petitioner's claim that he was unable to participate in his soccer league is not supported by the record in this case.  At the November 2018 fact hearing, petitioner testified that his left shoulder injury had not interfered with his ability to play soccer.  Tr. at 37-38.  He also testified that his injury had not interfered with his work, which involved sitting at a desk while working on a computer.  In contrast, in medical records from the first half of 2015, petitioner routinely stated that he had difficulty sleeping, dressing, and performing household tasks such as raking the yard.  Tr. at 38-39.  There is evidence to establish petitioner suffered these limitations but insufficient evidence to show he was prevented from playing soccer.

Thus, while some circumstances of petitioner's shoulder injury are similar to those experienced by the petitioner in *Attig,* for example the need for one cortisone injection and a comparable amount of PT, there are significant differences which indicate the award for this petitioner should be less than that awarded in *Attig.*  In addition to the length of treatment and severity of limitations experienced, it appears the petitioner in *Attig* suffered more immediate and severe pain.  In contrast to the petitioner in this case who delayed seeking treatment until more than four months after vaccination, the petitioner in *Attig* was seen by an orthopedist within 12 days of vaccination.  *Attig,* 2019 WL 7049405, at *2.

Likewise, there are some differences between the injury suffered by the petitioner in this case and the SIRVA suffered by the petitioner in another case cited by petitioner, *Capasso,* in which petitioner was awarded $75,000.00 for his actual pain and suffering.  In *Capasso,* the petitioner sought treatment for his shoulder injury within 19 days of vaccination.  2019 WL 5290524, at *2.  He then treated for at least eight months.  *Id.*, at *2-4.  Although the *Capasso* petitioner attended less PT and had better ROM than the petitioner in this case, due to the nature of his work, he was forced to modify his duties by 50%.  *Id.*, at *11.  Additionally, it appears the *Capasso* petitioner suffered moderate to severe pain throughout the months he received treatment.

However, petitioner's actual pain and suffering was more significant that what was experienced by the petitioner in *Knauss,* who received $60,000.00.  In that case, the petitioner suffered only mild pain, rated as one on a scale of ten, for the duration of his injury, approximately one year.  *Knauss,* 2018 WL 3432906, at *2-4.  Thus, while there are several similarities between this case and *Knauss,* a comparable delay in seeking treatment and evidence of degenerative changes which could have contributed to petitioner's pain and limited ROM, the undersigned finds petitioner's award should be greater than the $60,000.00 awarded in *Knauss.*

Looking at the totality of circumstances and entire record in this case, the undersigned finds $70,000.00 to be an appropriate amount for petitioner's past pain and suffering.  No amount is awarded for projected pain and suffering.

## VIII.    Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **the undersigned finds that $70,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[19] The undersigned also finds that petitioner is entitled to $705.23 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $70,705.23, representing compensation in the amount of $70,000.00 for petitioner's actual pain and suffering and $705.23 for petitioner's actual unreimbursable expenses in the form of a check payable to petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[20]

**IT IS SO ORDERED.**

<div align="right">

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

</div>

---

[19] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.